# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | **Criminal Action** |
| | ) | |
| **v.** | ) | **Case No.17-10088-01-EFM** |
| | ) | |
| **SHEA THOMPSON,** | ) | |
| **Defendant.** | ) | |
| | ) | |

### UNITED STATE'S RESPONSE TO MOTION FOR DISCOVERY (DOC. 18)

This Court, like virtually every other court[1] to confront this type of motion in relation to this national operation, should deny the defendant's motion to compel discovery. The defendant's motion demands information that is immaterial to his motions, rests on speculation, and seeks information was properly subject to the qualified law enforcement privilege or not "relevant and helpful" under CIPA.

### I.      Background

The defendant has been indicted on two counts relating to child pornography. (Doc. 1). Highly summarized[2], the defendant was identified as a user of a website devoted to child pornography which operated on the TOR network. TOR is an acronym for The Onion Router. TOR software allows users to access the network, which randomly and repeatedly bounces the connections around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address.

---

[1] The United States has complied a listing of cases (in Section V below) arising out of the very same national operation, where other courts have considered similar motions and denied them.

[2] A more detailed explanation is contained in the search warrant affidavits, filed as attachments to the defendant's motions to suppress (Docs. 20-1 and 21-1).

Using TOR, users of the child pornography website were able to mask their IP addresses when they accessed the website, thus preventing law enforcement from identifying the user's physical locations of access. However, in late February 2015, the FBI was able to capture the administrator and the server of the website itself. With judicial authorization, the FBI continued to operate the server for a period of approximately 2 weeks. During that time, and with judicial authorization, the FBI deployed a Network Investigative Technique (NIT) onto the server of the website, located in the Eastern District of Virginia.

Via the NIT, FBI agents could collect certain information for users that accessed the website. That information included and was limited to: the accessing computer's actual IP address and the date and time associated with the collection of the IP address; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86); information about whether the NIT had already been delivered to the computer; the computer's Host Name; the computer's active operating system username; and the computer's MAC address. Thus, the NIT collected the IP address to allow investigators to find the physical location of access, and the NIT collected additional information identifying the specific device undertaking the access.[3]

During this time, on March 3, 2015, the defendant logged into to the child pornography website using the account "thedirtbed." According to logs from the website, "thedirtbed" originally registered on September 5, 2014. According to the Statistics section for the user-profile, "thedirtbed" had been actively logged into the website for a total of 6 hours and 43 minutes

_____

[3] For instance, the IP address might return to a business, and the additional information would allow for identification of the specific computer used within that business for the access.

between the dates of September 5, 2014 to March 4, 2015. On March 3, 2015, the defendant logged in to the child pornography website using his "thedirtbed" account and accessed the "Girls HC thread Quickie. But goodie" forum and, more specifically, post 19246, which contained a link to a multiple photo image (commonly referred to as a contact sheet) depicting a prepubescent female performing oral sex on a male's penis. Again, on March 4, 2015, the defendant logged in to the child pornography website using his "thedirtbed" account. He accessed the "Pre-teen Photos/Girls HC" forum and, more specifically, a post entitled "Ali-Lucy." On this date he also accessed the "Preteen Girl thread Helo/Helen" forum and, more specifically, post 16869, which contained a link to 46 individual photos depicting a nude prepubescent female engaged in various sexually explicit activities, including performing oral sex on an adult male's penis. Via the NIT, investigators learned the user "thedirtbed" connected to the website from IP address 68.103.99.59 with a computer using a Windows operating system, hostname "WIN-HKHNTOPT0TH" and log-on name "Shea." The IP address ultimately returned to Cox Communications subscriber Kim Thompson at a residence in McPherson, Kansas. Kim Thompson is the mother of Shea Thompson, who resides at the same address.

Investigators obtained a residential search warrant based, in part, on the location associated with the IP address. On March 9, 2016, FBI agents executed the warrant for the residence and approached the defendant's mother, the defendant himself, and later his father. These interactions are audio-recorded. At minute marker 5:35[4], Special Agent (SA) Angie Jones advised the defendant and his mother that they were not under arrest and free to leave if they wanted, but they would like to talk to them if they would be willing to speak. The defendant's mother emphatically

---

[4] The minute markers referenced herein relate to the recording of the defendant, which begins with the agents approach to the residence.

stated yes. At minute marker 13:11, SA Jones again repeated, in the defendant's presence, "you're free to leave if you feel like you want to leave." At minute marker 14:15, SA Jones repeated to the defendant, "You're not under arrest, you're not going to be under arrest unless you get crazy and try to fight us or something. And if you want to leave at any time, you are free to do that, okay?" During his subsequent voluntary and non-custodial interview, the defendant admitted to downloading child pornography (e.g., minute marker 18:05). He admitted to using TOR to view child pornography (minute marker 18:50). He admitted to installing TOR "a couple of years" ago (minute marker 19:00). He would delete the program (because he knew his conduct was illegal) and would later reinstall (minute marker 19:40). He admitted he first accessed child pornography a few months after downloading TOR, a year and a half to two years earlier (minute marker 21:00). He admitted familiarity a number of child pornography websites, as well as the website that lead to the search warrant (minute marker 22:08). He admitted he downloaded child pornography for sexual gratification, deleting it after using it (minute marker 24:25). He admitted he used his laptop (MacBook Pro) and desktop (Mac Pro Cylinder) computers to do this (minute marker 25:04). He admitted using "thedirtbed" as a username exclusive to his TOR activity (minute marker 35:23). At the conclusion of his interview, the defendant was left at his home, i.e., he was not arrested.

Subsequent forensic analysis revealed multiple videos of child pornography on the defendant's Mac Pro Cylinder. The TOR browser, or files associated with the TOR browser, was found on the Mac Pro Cylinder, MacBook Pro, and an external harddrive.

The defendant was indicted on a two count Indictment for violations of 18 U.S.C. § 2252A(a)(5)(B). Count 1 related to child pornography found on a number of devices in the defendant's possession on March 10, 2016. Count 2 related to access of child pornography, for

activity observed on the child pornography website on March 4, 2015, during the FBI's administration of the child pornography website.[5]

## II. The defendant's request seeks immaterial information

The first part of the defendant's request seeks information that is unrelated to him. Instead, his request targets the total number of downloaded pictures and videos and the total number of website visitors during the operation.[6] His request also seeks information to show the operation was "in fact a course of action approved by the government."[7] He asserts this information would be relevant to his "burden of showing the government's conduct offends common standards of decency to a degree warranting dismissal." Doc. 18, p. 3. In fact, the defendant substantially misstates his burden.

To clarify, a defendant asserting the outrageous governmental conduct defense bears the burden of proving either "(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir.1994); *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013). "[W]orry

---

[5] After consultation with attorneys at the DOJ Child Exploitation and Obscenity Section, it has been recommended to proceed on Count 1 and dismiss Count 2, to optimize trial resources - the evidentiary presentation relative to Count 1 would be considerably easier, involving fewer witnesses that are more closely located to the District of Kansas. A dismissal of Count 2 may also render moot some, or all, of the defendant's motion to compel.

[6] The defendant asserts the government "has not disputed that it can access and provide all of the data and records" for this request. To the contrary, the United States' January 19, 2018 letter explained in clear terms how and why some of the requested information is unknown.

[7] The suggestion that this national operation might be the product of a rogue agent or agents is, in a word, absurd. Moreover, even if that were the case, it would not change the government's role in the operation for purposes of the "outrageous governmental conduct" analysis. Rogue or no, it's still the government.

exists only when the government 'engineer[s] and direct[s] the criminal enterprise from start to finish.'" *Dyke*, 718 F.3d at 1288 (quoting *Pedraza*, 27 F.3d at 1521). By contrast, the government is free "to infiltrate an ongoing criminal enterprise," and "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *United States v. Mosley*, 965 F.2d 906, 911 (10th Cir.1992); see also *Dyke*, 718 F.3d at 1288. "As part of its effort to induce a suspect to 'repeat, continue, or expand criminal activity,' moreover, we have said 'the government can suggest the illegal activity,' 'can provide supplies and expertise for the illegal activity,' and 'can act as both supplier and buyer in sales of illegal goods.'" *Dyke*, 718 F.3d at 1288 (quoting *Mosley*, 965 F.2d at 911–12. Thus, the burden is not to show "the government's conduct offends common standards of decency."

The defendant fails to articulate how his requested information would relate, in any way, to showing the government "created" the crime, and much less how it created the crime *of this defendant*. In this case, the website was already in existence, and the defendant was *already involved* as a member well before the government took over the website and monitored it. Moreover, the requested information would not show "significant governmental coercion" to induce *the defendant* – indeed, the defendant plainly seeks information about "all visitors," not just himself. The defendant's request plainly seeks information that has no bearing on the defendant's relationship with the website nor to the government's conduct in relation to the defendant. The defendant's motion to compel discovery of the requested materials should be denied.

## III.     The defendant has failed to show that the NIT code is material to his defense

Under Federal Rule of Criminal Procedure 16, a criminal defendant has a right to inspect documents, data, or tangible items within the government's "possession, custody, or control," that

are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). "[I]n the context of Rule 16, 'the defendant's defense' means the defendant's response to the government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996). The term "defense" means an argument in response to the prosecution's case-in-chief, i.e., an argument that refutes the government's claims that the defendant committed the crime charged. *Id*.

The defendant bears the burden to make a prima facie showing of materiality. *United States v. Simpson*, 845 F.3d 1039, 1056 (10th Cir. 2017), cert. denied, No. 16-9476, 2017 WL 2483489 (U.S. Oct. 2, 2017). To be material, the evidence must bear some abstract, logical relationship to the issues in the case such that pretrial disclosure would enable the defendant to significantly alter the quantum of proof in his favor. *United States v. Lloyd*, 992 F.2d 348, 350-51 (D.C. Cir. 1993). Evidence is material when there is a strong indication that it "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id*. at 351 (internal quotations omitted). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Allen*, 603 F.3d 1202, 1215 (10th Cir.), cert. denied —— U.S. ——, 131 S.Ct. 680 (2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir.1994).

Rule 16 does not authorize a defendant to embark on a fishing expedition, which is exactly what the defense request amounts to. *See Jencks v. United States,* 353 U.S. 657, 667 (1957) (quoting *Gordon v. United States,* 344 U.S. 414, 419, 73 S.Ct. 369, 97 L.Ed. 447 (1953)); *United*

*States v. Harmon,* 871 F. Supp. 2d 1125, 1147 (D.N.M. 2012), aff'd, 742 F.3d 451 (10th Cir. 2014).

The threshold showing of materiality is essential because ordering the government to produce discovery absent such a showing is inconsistent with Rule 16. *United States v. Coriz*, 2017 WL 4351754, at *1 (D.N.M. Sept. 28, 2017) (citing *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) and *United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003)).

In this case, the defendant seeks "all records related to the Government's review and approval" of the operation (writ large). The defendant requests the "total number of pictures and videos" downloaded from the entire website during the FBI operation, as well as the "total number of visitors." The defendant also requests a copy of the NIT programming code for three stated reasons:

(1) "so that [his] computer forensics expert can independently determine the full extent of the information the Government seized from [his] computer when it deployed the NIT;"
(2) "whether the NIT interfered with or compromised any data or computer functions;" and
(3) "whether the government's representations about how the NIT works" are complete and accurate.[8]

Doc. 18, p. 3. As the defendant notes, his expert has been allowed to examine the defendant's devices – his expert has found no evidence to suggest tampering with the defendant's devices. The defendant's expert also appears unconcerned with reconciling his unidentified defense with the defendant's inculpatory admissions in his non-custodial interview. It is difficult to see how any of the above information could be material to an as-yet-unidentified defense.

A.    The extent of the information seized from the defendant's computer

As explained in the NIT search warrant affidavit, the NIT programming code consists of computer instructions that caused a user's activating computer to deliver certain authorized

---

[8] This request is a verbatim copy of the request made, and subsequently denied, in local case *United States v. Cookson*, 17-10087-01-JTM.

information to a computer controlled by the government. Review of the programming code is unnecessary to determine the extent of information seized from the defendant's computer by operation of the NIT because the information collected by the NIT has already been provided to the defense, and that information answers this question. It includes the defendant's IP address, a unique identifier generated by the NIT to distinguish the data from other computers, information about whether the NIT had already been delivered to the computer, and the computer's operating system, "Host Name," active operating system username, and Media Access Control ("MAC") address.

The defense can point to no evidence which would suggest the NIT misidentified the defendant or that the NIT provided more information than allowed in the search warrant. The defendant makes no attempt to address the defendant's voluntary statement as an indicator that the NIT accurately (and only) identified a user of the TOR website that accessed child pornography. These failures indicate that the defense is not really interested in "the full extent of the information seized" as he suggests. Instead, it indicates a plain desire to obtain NIT source code to reveal the specific way in which law enforcement was able to thwart the defendant's anonymization.

Even if the NIT had collected other information, as the defendant imagines, only *that* information could be subject to suppression as outside the scope of the warrant—*not the information specifically authorized by that warrant*. Because, however, there is no such further information, *there is nothing to suppress* and no compelling need for an expert to independently determine the "full extent" of information obtained via the NIT.

**B.      Interference with or compromised data or function**

Review of the programming code is also not material for the purpose of determining whether the NIT interfered with or compromised any data or computer functions. The defense

points to no evidence that the NIT in question, nor anything else, made changes to the defendant's laptop or desktop (much less the devices upon which child pornography evidence was found). Thus, the defendant's contention that the NIT or something else harmed his computer is purely theoretical. The defense points to no evidence that the NIT initiated any changes to his devices (where TOR was located) or settings that would warrant concern that the identifiers misidentified Thompson as "thedirtbed."

Given the fact that the defendant admitted to using TOR to access, view, and download child pornography, it is difficult to see how the NIT source code would be material to any defense as to Count 2. Importantly, Count 2 is not based on something found on the defendant's computer, but is instead based on activity logs and request data collected via the website he was accessing. The NIT source code has no relation to that data – that activity was not collected through the NIT. Thus, the defendant's concern that a hypothetical something could have possibly been placed on his desktop computer is a red herring. It is rank speculation. Moreover, the defendant's concern has no materiality as to the other devices containing child pornography, sustaining Count 1. Again, the defendant's motion is based on speculation without factual support or logical connection to any defense.

C. **The government's representations about how the NIT works in its warrant applications were complete and accurate**

Review of the programming code is also not material for the purpose of determining whether representations about how the NIT works are complete and accurate. By its nature, this is an entirely speculative request that any defendant could make, at any time, in any case, in an effort to justify any request for information from the government. The defendant presents no facts to suggest that the government is in possession of any information helpful to the defense on that issue. Nor does he even claim that the NIT worked other than as described, just that he needs to verify

that its actual operation comported with that description. Such rank speculation cannot support a finding of materiality.

In fact, this sort of speculative request turns the criminal discovery process on its head. If the standard for obtaining criminal discovery were, "What if the government's representations were not correct or complete," then there would be no limitation to criminal discovery and every defendant would be entitled to fish through every scrap of information in the government's possession in order to look for something that might impeach a government representation. That is inconsistent with the disclosure requirements established by Rule 16, *Brady*, and *Giglio*.

With respect, specifically, to the descriptions of the NIT set forth in the search warrant affidavit, the defendant has not identified any facts to suggest that those descriptions, in particular, are incomplete or inaccurate, despite having received substantial information pertaining to the use and execution of the NIT warrant on his computer, specifically—including exactly where on the website he was when he received the NIT. He also has had access to the forensic examination of the devices seized from his home, along with his recorded interview. Even having all of this, the best the defendant can do is hypothesize that the NIT *could* have worked other than as described, which *may* provide him a defense. He cannot even muster an explanation as to what, if any, description of the NIT he is unable to test. A defendant can always allege, absent factual support, that it is arguably *possible* that the government did not include complete and accurate information in a search warrant. However, a mere allegation simply will not supply a basis for seeking to rummage through the government's files.

The defendant makes no showing as to how the NIT programming code, as opposed to other information that has been or could be made available, would actually further his defense. Rather he merely speculates that such a review *might* produce information that *could* impeach the

NIT warrant or testimony concerning the process by which he was identified. "Mere speculation that Brady material exists does not justify fishing expeditions in government files." *United States v. Paulino*, 1996 U.S. App. LEXIS 30032, at \*4 (4th Cir. Nov. 20, 2006); *see also United States v. Crowell*, 586 F.2d 1020, 1029 (4th Cir. 1978); *United States v. Brown*, 360 F.3d 828, 833 (8th Cir. 2004) ("[M]ere speculation that materials may contain exculpatory evidence is not . . . sufficient to sustain a Brady claim); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970) ("[A]ppellants' mere speculation about materials in the government's files [does not require] the district court or this court under Brady to make the materials available for their inspection."). Absent the required factual showing, the defendant's request amounts to nothing more than a fishing expedition, which is not sanctioned by Rule 16 or any other law.

### D. The information sought is not relevant to his suppression motion involving the NIT (Doc. 20)

The information sought by the instant motion is not relevant to the suppression motion (Doc. 20) currently pending before the Court - the defendant does not challenged the extent of information identified by the NIT or the NIT's technical aspects, operation, or functionality – either generally or with respect to the defendant specifically. Accordingly, the NIT source code and an independent forensic analysis of the same are neither relevant nor necessary to the Courts' determination of that pending motion.

It is difficult to understand how the NIT source code could further aid the defendant in understanding how the NIT operated in relation to his devices. Investigators installed the NIT in the Eastern District of Virginia on the server that hosted Playpen. When defendants logged on and retrieved information from that server, they also retrieved the NIT. The NIT then sent network information from their computer back to law enforcement. These facts are not in dispute. The

defendant does not dispute that the NIT was deployed from the server in EDVA when his computer in Kansas accessed the website, or that the NIT sent information back to EDVA from Kansas, where it was collected. In fact, that is the crux of his complaint in his motion to suppress the NIT - whether Rule 41 (or 28 U.S.C. §§ 636) allowed the issuance of the warrant *in light of those facts*. *See* Doc. 20, p. 25. In this regard, resolution of the defendant's motion to suppress does not require the NIT source code; rather, it requires the Court's determination as to how the law applies to those facts.

**IV.    The NIT Programming Code is Subject to Qualified Law Enforcement Privilege**

If the Court finds—as it should—that the defendant has failed to meet his burden to show that the requested information is material and otherwise discoverable under Rule 16, that will resolve the defendant's motion. In the event the Court were to determine that the NIT programming code is material to Cookson's defense, however, then the requested information pertaining to that code is nevertheless subject to a qualified law enforcement privilege, as its disclosure would be harmful to the public interest.[9]

Specifically, disclosure could diminish the future value of important investigative techniques, allow individuals to devise measures to counteract these techniques in order to evade detection, discourage cooperation from third parties and other governmental agencies who rely on these techniques in critical situations, and possibly lead to other harmful consequences not suitable for inclusion in this response. As explained below, courts have generally recognized that, because of the sensitivity of information that may support this type of privilege claim, it is appropriate to

_____

[9] Further, the FBI has derivatively classified portions of the tool, the exploits used in connection with the tool, and some of the operational aspects of the tool in accordance with the FBI's National Security Information Classification Guide.

consider a submission from the government ex parte and in camera. Accordingly, in the event it determines the defendant's request for programming code is material, the United States accordingly requests that the Court permit the United States to offer evidence in support of its privilege claim *ex parte* and *in camera*.[10]

The privilege has its roots in *United States v. Roviaro*, where the Supreme Court first recognized a qualified "informer's privilege" that protects the identity of government informants. 353 U.S. 53, 59 (1957). Courts have since extended the qualified privilege in *Roviaro* to cover other investigative techniques, including traditional and electronic surveillance. For example, in *United States v. Green*, the D.C. Circuit applied the privilege to bar disclosure of the location of an observation post in a drug investigation because failing to do so would "likely destroy the future value of that location for police surveillance." 670 F.2d 1148, 1155 (D.C. Cir. 1981). In *United States v. Van Horn*, the Eleventh Circuit applied the privilege to bar disclosure of the nature and location of electronic surveillance equipment because disclosure would "educate criminals regarding how to protect themselves against police surveillance." 789 F.2d 1492, 1507 (11th Cir. 1986); see also *In re The City of New York*, 607 F.3d 923, 928-29 (2d Cir. 2010) (finding that the district court erred by failing to apply the privilege to reports made by undercover agents because they contained "detailed information about [] undercover operations," disclosure of which would "hinder [law enforcement's] ability to conduct future undercover investigations"). The purpose of the privilege is, among other things, "to prevent disclosure of law enforcement techniques and

---

[10] Should the Court permit the ex parte and in camera submission, the government advises that a Classified Information Security Officer with the Litigation Security Group at the U.S. Department of Justice will have to assist in providing certain documents to the Court. Arranging for this may cause a short delay, and the government requests the Court's indulgence in arranging such an event.

procedures." *In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir. 1988); *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007).

The government bears the initial burden of showing that the law enforcement privileges applies to the materials at issue, *In re The City of New York*, 607 F.3d at 944, and the courts then apply a balancing test in determining whether disclosure is required, *Van Horn*, 789 F.2d at 1508. To meet its initial burden, the government must show that the materials contain information that the law enforcement privilege is intended to protect, which includes "information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witnesses and law enforcement personnel [or] the privacy of individuals involved in an investigation, and information that would otherwise . . . interfere[] with an investigation." *In re The City of New York*, 607 F.3d at 944 (citations and internal quotation marks omitted); *see also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007) (extending privilege recognized for "confidential government surveillance information" to "law enforcement techniques and procedures").

Because the evidence required to establish the privilege is often sensitive, courts have recognized that it is appropriate to permit the government to make its showing through an *ex parte* and *in camera* evidentiary hearing, the record of which should be sealed for later review. *See, e.g., United States v. Johns*, 948 F.2d 599 (9th Cir. 1991) (approving, over the defense objection, court's consideration of the government's request to maintain the confidentiality of an informant in an ex parte, in camera hearing); *United States v. McLaughlin*, 525 F.2d 517, 519 (9th Cir. 1975) (upholding trial court's conducting of in camera hearing regarding disclosure of informant's identity and determining that disclosure was not required); *United States v. Fixen*, 780 F.2d 1434, 1439-40 (9th Cir. 1986) (suggesting use of in camera proceedings to resolve law enforcement

privilege issues); *United States v. Kiser*, 716 F.2d 1268, 1273 (9th Cir. 1983) (remanding to district court to conduct ex parte, in camera hearing pertaining to *Roviaro* privilege issue and citing cases authorizing in camera hearings in similar situations); *Van Horn*, 789 F.2d at 1508 (district court held in camera hearing); *Global Relief Found, Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002) ("Ex parte consideration is common in criminal cases where, say, the identity of information might otherwise be revealed"); *In re Department of Homeland Security*, 459 F.3d 565, 569-71 (5th Cir. 2006) (instructing the district court in a civil case to "review the documents at issue in camera to evaluate whether the law enforcement privilege applies"); *In re The City of New York*, 607 F.3d at 949 (determining requesting party did not have compelling need for requested information based on in camera review of the documents); *Rigmaiden*, 844 F. Supp. 2d at 982 (denying defendant's requests for discovery concerning investigative technique after ex parte, in camera review at which the court heard the government's reasons for nondisclosure); *cf. In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 253 (4th Cir. 2005) (approving the use of ex parte and in camera review of allegedly privileged documents in the context of a crime-fraud exception claim).

The defendant contends that, pursuant to Rule 16, he is entitled to the NIT source code because such information may reveal the accuracy of the data the government used to identify the defendant on the child pornography website. For the defendant to obtain such information, he would have to show that disclosure would alter the quantum of proof in his favor. See *United States v. Lloyd*, 992 F.2d 348, 350-51 (D.C. Cir. 1993). In other words, defendant bears the burden of showing that the information he seeks will raise doubt that the NIT accurately identified him as the individual accessing and downloading child pornography. In this case, the defendant gave a voluntary, recorded interview wherein he admitted to using the TOR browser for years, to view

child pornography, using "thedirtbed" as his username. It is unfathomable (and the defendant does not attempt to explain) how the NIT source code itself could reasonably be expected to rebut that evidence.

At an *ex parte in camera* hearing, the United States can provide a more detailed presentation about both the nature of the information that the defendant is requesting and the government's concerns regarding its disclosure. Because of the sensitivity of the technique and for other reasons, simply filing the material under seal with a protective order is inadequate to address the government's concerns. Indeed, courts have recognized that sealing documents and materials containing such sensitive information is frequently inadequate to prevent its public disclosure. *See, e.g., In re The City of New York*, 607 F.3d at 937-39 (citing numerous specific examples of instances where "sealed" materials were inadvertently or intentionally disclosed, and concluding that "[i]n light of how often there are all-too-human lapses with material filed 'under seal'" that it could not "conclude with confidence that filing" the sensitive information would adequately protect the information from public disclosure).

Upon a finding that the privilege applies, there is a "pretty strong presumption against lifting the privilege." *In re The City of New York*, 607 F.3d at 945 (quoting *Dellwood Farms v. Cargill*, 128 F.3d 1122, 1125 (7th Cir. 1997)). The burden shifts to the defendant, who must show that his need for the information overcomes the public interest in keeping it secret. *See Alvarez*, 472 F.2d at 113 (finding, regarding disclosure of informer identity, that "in balancing the interest of the government against that of the accused, the burden of proof is on the defendant to show the need for disclosure); *see also Van Horn*, 789 F.2d at 1507. The public interest in keeping the information private must be balanced against a defendant's articulated need for the information. *See Roviaro*, 353 U.S. at 628-29. "Whether a proper balance renders nondisclosure erroneous must

depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the [privileged information], and other relevant factors." *Id*. at 629.

In conducting this balancing, the court should consider the defendant's "need [for] the evidence to conduct his defense and [whether] there are . . . adequate alternative means of getting at the same point. The degree of the handicap [to the defendant] must then be weighed by the trial judge against the policies underlying the privilege." *United States v. Harley*, 682 F.2d 1018, 1020 (D.C. Cir. 1982); *United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (the question is "whether the [defendant] demonstrate[s] an authentic 'necessity,' given the circumstances to overbear the qualified privilege); *United States v. Foster*, 986 F.2d 541, 543 (D.C. Cir. 1993) (balancing the defendant's need for information against importance of government's interest in avoiding disclosure).

In striking this balance, the Court should also keep in mind that the need for disclosure is more limited in the context of a suppression hearing than at trial. *See McCray v. Illinois*, 386 U.S. 300, 311 (1967); *see also Rigmaiden*, 844 F. Supp. 2d at 990 (applying *McCray* in the context of motion for disclosure of electronic tracking equipment). Even if the party seeking disclosure successfully rebuts the presumption (by a showing of, among other things, a "compelling need"), the court must still then weigh the public interest in non-disclosure against the need of the litigant for access to the privileged information before ultimately deciding whether disclosure is required. *In re the City of New York*, 607 F.3d at 948.

As can be explained in more concrete terms in an *ex parte, in camera* hearing, the public interest in nondisclosure here significantly outweighs the defendant's need for the information, particularly in light of the defendant's speculative claims regarding the materiality of the requested

information. In particular, the risk of circumvention of an investigative technique if information is released has been recognized as a factor in applying law enforcement privilege to electronic surveillance. *See Van Horn*, 789 F.2d at 1508.[11] Accordingly, in the event the Court finds the requested information to be material, the Court should hold an *ex parte, in camera* hearing to assess the applicability of the privileges and the defendant's need for the materials.

The analysis of the Sixth Circuit in *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015) is instructive here. *Pirosko* affirmed the district court's denial of a motion to compel disclosure of "the law enforcement tools and records" (there, ShareazaLE, a proprietary program used exclusively by law enforcement) used to search a defendant's computer for child pornography. 787 F.3d at 362. Similar to this case, the defendant in that case presented a purported expert declaration claiming that analysis of the government's investigative tools "can determine whether law enforcement officers manipulated data on the subject computer [or] the error rates in records used." *Id*. at 363. The defendant also contended that review of the source code was necessary to allow "his experts to determine whether [the software] gives government officials 'the ability to manipulate settings or data on the target computer (even unintentionally),' 'whether the software allows agents to override shared settings to download files that a normal user would not be able to download,' and 'the error rate' associated with the software." *Id*. at 365. As here, the defendant produced no evidence to suggest that any of those speculative concerns were actually manifested

---

[11] Risk of circumvention has also been accepted by numerous courts as a basis for nondisclosure in the civil FOIA context. *See, e.g., James v. U.S. Customs and Border Protection*, 549 F. Supp. 2d 1, 10 (D.D.C. 2008) (concluding that CBP properly withheld information under FOIA that "could enable [others] to employ measures to neutralize those techniques"); *Judicial Watch v. U.S. Department of Commerce*, 337 F. Supp. 2d 146, 181-82 (D.D.C. 2004) ("[E]ven commonly known procedures may be protected from disclosure if the disclosure if the disclosure could reduce or nullify their effectiveness.")

– such as, through an examination of the defendant's computers. The government objected to disclosure on both Rule 16 materiality and law enforcement privilege grounds, arguing that granting the motion to compel "would compromise the integrity of its surveillance system and would frustrate future surveillance efforts." *Id*. at 365. The Court of Appeals for the Sixth Circuit endorsed the government's argument on both points, holding that "it is important for the defendant to produce some evidence of government wrongdoing" – which that defendant had failed to do – when balancing the government's assertion of the law enforcement privilege against the needs articulated by a defendant. *Id*. at 365-66 (emphasis supplied).

Similarly persuasive is the District Court's analysis in *United States v. Rigmaiden*. In that case, the government, acting on the authority of a tracking device warrant, used a cellular site simulator in order to locate a wireless "aircard" that assisted in locating and ultimately identifying the defendant.[12] The defendant moved to compel production of additional information pertaining to the technology, methods, and personnel involved in tracking the "aircard." The government provided information pertaining to the aircard tracking, but opposed disclosure of technical details, asserting law enforcement privilege. Following hearings related to the issues, the Court denied the defendant's requests, finding either they were speculative and accordingly, not material, or that the defendant had not demonstrated a compelling need in light of the government's persuasive showing regarding the law enforcement privilege. *Rigmaiden*, 844 F. Supp. 2d at 996-1004.

Here, the defendant cannot demonstrate any compelling need for the requested information. As demonstrated above, his requests are entirely speculative and conclusory. Such requests are insufficient to justify a compelling need, in light of the government's assertion of privilege. *See*

---

[12] An "aircard" may be attached to a laptop in order to provide Internet service.

*United States v. Buras*, 633 F.2d 13566, 1360 (9th Cir. 1980); *Guzman-Padilla*, 573 F.3d at 890. The defendant cannot compel disclosure based simply on his conjecture that privileged material may contain something relevant.

In addition, the defendant has been provided or has access through discovery to "adequate alternative means of getting at the same point" to which he claims disclosure of the information is relevant. *Harley*, 682 F.2d at 1020. The government is willing to provide the computer instructions comprising the NIT that, when executed, produced the NIT results. This information would allow him to verify that the particular instructions would have produced the particular results and therefore that the NIT was properly described and operated consistent with that description. A copy of the forensic report of his computer, and other devices, and substantial information pertaining to his dates of access to the pertinent site and the date and time at which the NIT identified his IP address accessing that site have been provided or have been made available (depending on whether contraband images are included). He may (and apparently has) analyze(d) that information to verify that the NIT did not interfere with or compromise any data or computer functions. And, to the extent the defendant wishes to request chain of custody documentation from the government regarding items to be admitted at trial, there are numerous avenues available for him to request such information short of seeking to rummage through the government's files or to compel the government to disclose privileged material. Accordingly, the defendant cannot establish the sort of compelling need required to outweigh the significant public interest in nondisclosure of additional materials pertaining to the use and execution of the court-authorized NIT.

## V.	Other courts have agreed with the government

The following decisions have denied motions to compel NIT "source code" information, finding the defense requests speculative, the information requested information immaterial, and/or that the information was properly subject to the qualified law enforcement privilege or not "relevant and helpful" under CIPA. *See, e.g. United States v. Jean*, 2018 WL 2448787 (8th Cir. June 1, 2018)(affirming district court's denial of defense motion to compel discovery of NIT source code, finding defendant failed to establish materiality and information was properly subject to qualified law enforcement privilege); *United States v. Palaniappan*, 2018 WL 1997973 (E.D.N.Y. Apr. 27, 2018)(finding exploit source code immaterial); *United States v. Stepus*, 2018 WL 1257804 (D. Mass. Mar. 12, 2018)(finding defendant failed to establish materiality and information was properly subject to qualified law enforcement privilege); *United States v. Stamper*, 2018 WL 1241575 (S.D. Ohio Mar. 9, 2018)(finding defendant failed to establish materiality and information was properly subject to qualified law enforcement privilege); *United States v. Harney*, 2018 WL 1145957 (E.D. Ky. Mar. 1, 2018)(finding defendant failed to establish materiality and information was properly subject to qualified law enforcement privilege); *United States v. Spicer*, 2018 WL 635889 (S.D. Ohio Jan. 31, 2018) (adopting *United States v. Gaver*, 2017 WL 1134814 (S.D. Ohio Mar. 27, 2017))(finding source code request immaterial); *United States v. Rosenblatt*, No. 17-cr-202 (N.D. Tex. Jan 8, 2018)(finding source code request immaterial); *United States v. Cookson*, 2017 WL 5629678 (D. Kan. Nov. 22, 2017)(finding source code request immaterial); *United States v. Acevedo-Lemus*, No. 15-00137-CJC (C.D. Cal. Oct. 30, 2017)(granting government's ex parte, in camera CIPA Section 4 motion to exclude classified information from discovery, finding that disclosure of the information could cause serious damage to national security, the information was neither discoverable under Fed. R. Crim. P. 16 nor

"relevant and helpful" to the defendant's defense, and that good cause existed for why it should be withheld from discovery); *United States v. Cruz-Fajardo*, 2017 WL 3634278 (N.D. Ga. Aug. 23, 2017)(finding defendant failed to establish any factual basis to support NIT source code requests); *United States v. Ammons*, No. 16-cr-011 (W.D. Ky. May 30. 2017)(finding NIT source code immaterial to defense); *United States v. Leal*, No. 17-cr-046 (S.D. Tex. May 26, 2017)(finding defendant failed to establish materiality, not reaching the issue of law enforcement privilege); *United States v. Gaver*, No. 15-cr-88, 2017 WL 1134814 (S.D. Ohio Mar. 27, 2017)( finding requested evidence immaterial and properly subject to qualified law enforcement privilege); *United States v. Dzwonczyk*, No. 15-CR-3134 (D. Neb. Dec. 29, 2016) (finding requested evidence immaterial and declining to reach the law enforcement privilege issue); *United States v. Owens*, 2016 WL 7351270 (E.D. Wi. Dec. 19, 2016)(same); *United States v. Tippens*, et. al., No. 16-CR-5110 (W.D. Wa. Nov. 30, 2016) (Bryan, Sr. J.)(applying Classified Information Procedures Act (CIPA), finding exploit-related information "material" but denying motion to compel because the information was classified and defendants had failed to show that it would be "relevant and helpful" to their defense; *United States v. McLamb*, 2016 WL 6963046 (E.D. Va. Nov. 28, 2016) (finding requested evidence immaterial and properly subject to qualified law enforcement privilege); *United States v. Eure*, No. 2:16-CR-43 (E.D. Va. Aug. 15, 2016) (same)(incorporating *Darby*); *United States v. Darby*, No. 16-cr-036 (E.D. Va. Aug. 12, 2016) (same); *United States v. Matish*, 193 F.Supp. 3d 585  (E.D. Va. 2016) (same); but see *United States v. Michaud*, No. 15-5351 (May 25, 2016)(finding exploit-related information legitimately withheld by the government, but still material, and excluding NIT-derived evidence and its fruits)(Bryan, Sr. J.). This Court should likewise deny the defendant's motion.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney


s/Jason W. Hart
JASON W. HART
Kan. S. Ct. No. 20276
Assistant U.S. Attorney
District of Kansas
301 N. Main, Ste. 1200
Wichita, Kansas 67202
Tel: 316-269-6481
Fax: 316-269-6484
Email: Jason.hart2@usdoj.gov

## CERTIFICATE OF SERVICE


I certify that on September 3, 2018, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to Trevor Riddle, attorney for defendant.


s/Jason W. Hart
JASON W. HART
Assistant United States Attorney