Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Olive W. Garvey Building
Wichita, Kansas 67202
Telephone: (316) 264-2800
Facsimile: (316) 264-4785

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-10088-EFM |
| | ) | |
| SHEA THOMPSON, | ) | |
| Defendant | ) | |
| _____ | ) | |

## MOTION FOR DOWNWARD VARIANCE AND
## SENTENCING MEMORANDUM IN SUPPORT THEREOF

COMES NOW, the defendant, Shea Thompson, through his counsel, Trevor D. Riddle, of Monnat & Spurrier, Chartered, and respectfully submits this sentencing memorandum in support of his request that the Court exercise its discretion to impose a sentence of probation. While this requested sentence is below the advisory guideline range, it would still be "sufficient, but not greater than necessary" to fulfill the sentencing goals established by Congress. 18 U.S.C. § 3553. In support thereof, Mr. Thompson argues that the section of the United States Sentencing Guidelines Manual applicable to his case, USSG §2G2.2, is flawed and excessively harsh, and when the seriousness of the offense and the public's interest is properly counterbalanced against Mr. Thompson's

personal characteristics, any period of incarceration would be "greater than necessary" to serve the mandated sentencing goals set forth under § 3553(a).

## INTRODUCTION

*It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.*

—*Koon v. United States*, 518 U.S. 81, 113 (1996)[1]

In determining the appropriate sentence, a district court "shall consider . . . the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A). And yet, while this Court must still correctly calculate the guideline range, it may not treat that range as mandatory or presumptive, but rather only "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Gall v. United States*, 552 U.S. 38, 49, 51 (2007); *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors" to "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall*, 552 U.S. at 53-60; *Pepper v. United States,* 131 S. Ct. 1229, 1242-43 (2011). The Court's overarching duty is to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing goals set forth by statute. *Pepper*, 131 S. Ct. at 1242-43 (§ 3553(a)).

---

[1] *See also United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (same) (quoting *Gall v. United States*, 552 U.S. 38 (2007) (internal quotations omitted)).

Any sentence imposed must properly and sufficiently punish the crime to which Mr. Thompson has pleaded guilty, but involve no greater deprivation of liberty than is reasonably necessary to implement Congress's statutorily-mandated sentencing goals. As will be set forth *infra* and at Mr. Thompson's sentencing hearing, the factors and circumstances presented in Mr. Thompson's case—including the genuine remorse Mr. Thompson feels and the sincere efforts he has made to transform himself and his life— cannot bear the weight of a prison sentence, let alone an excessively long within-guideline sentence.

Mr. Thompson respectfully asks this Court to exercise its discretion by granting his motion for a downward variance and imposing a term of probation. Given Mr. Thompson's age and his personal growth and maturation during the pendency of this case, this Court has a unique opportunity to effect real, lasting, positive change in a young man's life. Mr. Thompson respectfully asserts that this sentence is "sufficient, but not greater than necessary" to serve the sentencing purposes under § 3553(a).

## ARGUMENT AND AUTHORITIES

I.     **Given the nature and circumstances of Mr. Thompson's offense, as well as his history and characteristics, the sentence requested is sufficient, but not greater than necessary to satisfy the purposes of sentencing, promote respect for the law, afford adequate deterrence, and avoid unwarranted sentencing disparities.**

For a sentence to be just, it must fit not only the crime but also the offender. *United States v. Huckins*, 529 F.3d 1312, 1316 (10th Cir. 2008). There is no question that the nature of Mr. Thompson's conviction is serious. The mitigating facts and circumstances unique only to Mr. Thompson, all of which will be argued in full at

3

sentencing, distinguish Mr. Thompson's culpability from others charged with these same offenses and sentenced under §2G2.2. In this case, there are numerous mitigating factors that, when taken as a whole, support the conclusion that a below-guideline sentence of probation, is sufficient, but not greater than necessary to fulfill the goals of § 3553(a).

A.    *Mr. Thompson's history and characteristics*

The young man coming before the Court for sentencing now is not the same person he was when he committed the crime he has pleaded guilty to. Considering the unique characteristics of his crime and his personal growth, this Court should recognize that Shea Thompson is an excellent candidate for probation.

 The investigation into Mr. Thompson began almost 4 years ago, when he was just 20 years old. His conviction is based on conduct from 2016. The intervening years have been key developmental years for Mr. Thompson. When he was first targeted in the pornography investigation, he was still a teenager. He was not yet old enough to drink when the search that yielded the evidence against him in this case occurred.

In the intervening years, Mr. Thompson has passed many milestones of growth and maturity. He has graduated from college, receiving a Bachelor of Science degree from Full Sail University in Music Production. He is now engaged to be married to a dedicated young woman, a nursing student. Mr. Thompson has transformed himself and his life since this offense occurred.

The early 20s are a critical period for brain development in young adults. *See* Terry A. Maroney, The False Promise of Adolescent Brain Science in Juvenile Justice, 85 NOTRE DAME L. REV. 89, 152 & n.252 (2009) (collecting studies); MIT Young Adult

Development Project: Brain Changes, MASS. INST. OF TECH., http://hrweb.mit.edu/worklife/youngadult/brain.html (last visited Aug. 4, 2015) ("The brain isn't fully mature at ... 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."); Jay N. Giedd, Structural Magnetic Resonance Imaging of the Adolescent Brain, 1021 ANN. N.Y. ACAD. SCI. 77 (2004) ("The dorsal lateral prefrontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early 20s" (formatting omitted)). Mr. Thompson's development during the pendency of this case is a prime example. He has, quite simply, grown up in the past four years.

Mr. Thompson's time on supervised pretrial release demonstrates what a perfect candidate for probation he is. Since his indictment in June 2017, Mr. Thompson has served on supervised pretrial release without incident. He has not only maintained employment, but made himself an invaluable employee, relied on by his boss at Freddy's Frozen Custard to train new employees. Jason Toler describes Mr. Thompson as a "foundational" employee. By using that word to describe Mr. Thompson, Mr. Toler suggests his business will feel Mr. Thompson's absence should he be sentenced to incarceration.

Those who know Mr. Thompson best know him to be polite, kind, and respectful. Jason Toler trusts Mr. Thompson with his children. For over a decade, Mr. Thompson has been a valuable, involved member of his church community. Both the lead Pastor of his church, Jon W. Black, and the Director of Adult Ministries, Rev. Black's wife, Lynn,

agree that Mr. Thompson is an indispensable member of their church. Because of his degree, Ms. Black counts on Mr. Thompson to run the church's sound system.

A month before the commencement of this investigation into Mr. Thompson, he had begun counseling, recognizing that he needed help to address some issues in his life. For five years, he had been involved in an unhealthy relationship. That relationship had finally ended. Mr. Thompson was struggling in the wake of that break-up. Mr. Thompson has continued working with that counselor to the present day. That counselor, Steven Nachtigal, reports that Mr. Thompson has made great strides as a result of his hard work in therapy. Mr. Thompson now shows a growth and maturity he did not possess four years ago.

Dr. Mitchell Flesher conducted a psychological evaluation of Mr. Thompson in preparation for sentencing. He agrees that Mr. Thompson does not pose a risk to the community such that incarceration is necessary. Instead, he suggests that Mr. Thompson's rehabilitation, which has already begun, would be better served by maintaining his connections to his community, his church, his family, and his fiancée. According to Dr. Flesher, Mr. Thompson would benefit from therapeutic services aimed at increasing his sexual knowledge. (Flesher Report, p. 8).

Mr. Thompson is not a sex offender who poses an ongoing risk of reoffending. At the time of this offense, he was simply an immature young man barely out of his teen years. Even at that age, though, he recognized he needed to change his behavior and tried to curb it on his own, by deleting materials he had previously viewed. When he found himself still struggling, he took the step of seeking outside help. For a 20-year-old man to

6

take that step of seeking therapy shows a tremendous commitment to his own rehabilitation, before he had any idea he would be facing criminal charges.

Mr. Thompson has already demonstrated he is an ideal candidate for probation. He has done this by seeking to change his behavior and improve himself before he came into contact with the criminal justice system. Once he was charged, Mr. Thompson made the conscious decision not to use his legal troubles as an excuse to hide away in limbo. Instead, he chose to continue living his life. He resumed his studies, completing his education and earning his degree. He learned to make healthy relationship choices instead of continuing his old, dysfunctional pattern. Through the last year and a half, he has accomplished these things while living under supervised release without incident. He has already done hard work to improve himself and make changes for the better. Just as he has already demonstrated the willingness and ability to abide by the rules and restrictions of supervision.

Mr. Thompson has no prior criminal history. His response to this initial, and only, contact with the criminal justice system shows that he has taken the matter seriously and understood the need to make changes in his life. Allowing this young man to continue his rehabilitation on probation is sufficient punishment but not greater than necessary to accomplish the purposes of 18 USC 3553(a)(2). This Court can feel confident that granting Mr. Thompson the chance to further prove himself on probation will not be an opportunity Mr. Thompson will waste or take for granted.

B. _Mr. Thompson's offense characteristics_

The crime of conviction does not carry with it any minimum sentence requirement. This Court should consider the specific facts of Mr. Thompson's offense and recognize the differences between Mr. Thompson's offense and the more typical child pornography offense

First, Mr. Thompson had a comparatively small amount of material on his devices, 17 videos, yet because those materials were videos, he qualifies for the highest level of the image enhancement. The image enhancement is so outdated as to have been rendered meaningless. To put it simply, everything these days is video. If videos were treated like individual images, there would be a huge distinction between the material found on Mr. Thompson's computer and actual collections of child pornography seen in other cases. By placing such outsize value on videos, this small amount is placed in the same category as one that contains thousands of images or videos, potentially encompassing thousands of exploited children.

The enhancement as currently applied to video, in an era where everything is video, makes no distinction between an individual with 8 videos and one with 4000, carefully categorized and duplicated on a back-up of a hard drive. The image calculation is based on the allegation that 17 videos were found on the computer. Each video is treated as having 75 images, equaling a total of 1,275 images. The enhancements separates offenders into only five categories: 1) offenders with fewer than 10 images, 2) between 10 and 150 images, 3) between 150 and 300 images, 4) between 300 and 600 images, and 5) 600+ images. While these categories genuinely distinguish large-scale

collectors of child pornography images from lesser offenders, those distinctions are lost in the translation to video. An offender with only four videos is classified in the second-highest level of offender and only four more places an offender in the top offense level. U.S.S.G. §2G2.2(7).

The calculus for this enhancement was created in 2003. In those earlier days of the internet, video sharing was far less common than it is today after the birth of YouTube (in 2005) and the rise of software and social media platforms that make video a standard format for sharing on the internet. Even though we have entered an era where video is ubiquitous, the sentencing enhancement calculating how much material a defendant possessed presumes an outdated medium, still photographs, are the standard by which defendants should be judged. The image calculation as applied to video no longer makes any meaningful distinction in the culpability of those with voluminous video collections from those, like Mr. Thompson, who possess very small amounts of material.

In its responses to Mr. Thompson's PSIR objections, the government suggested Mr. Thompson's offenses were actually worse because he told law enforcement he would download and then delete materials previously. First, the government has no evidence of this happening with any frequency or in great quantities. Second, the government would have Mr. Thompson's admission of past failings and his efforts to take personal responsibility for those failings as evidence that his offense is somehow worse than it appears. The fact remains that Mr. Thompson had a very small number of videos relative to other offenders who download videos.

The mitigation report prepared by Loehrs and Associates supports the conclusion that Mr. Thompson is not like the typical pornography offender. Offenders often involve themselves in communities of other child pornography offenders, engaging in chat forums or message groups. A thorough forensic review of Mr. Thompson's devices, though, shows that he did not participate in any such forums or groups. (Loehrs Report, p. 3).

Mr. Thompson's internet activity as reflected by a forensic examination of his devices also was not like that of a typical offender. "No forensic evidence was located on any of the digital items seized from Mr. Thompson consistent with the user collecting or subscribing to child pornography content. Additionally, no forensic evidence was located indicating the user searched the Internet for material relating to child pornography." (Loehrs Report, p. 3).

Additionally, the amount and organization of the materials found on Mr. Thompson's computer are not like those of the more typical pornography offender. Mr. Thompson was not backing up a voluminous collection of child pornography onto a second hard drive. He was not categorizing a collection. Nor was he using encryption technology to try to hide his illicit activities. Instead, the small amount of material found on his computer was found in a default iTunes directory. (Loehrs Report, p. 4).

Throughout the country, other courts have found probation to be appropriate in some child pornography cases, cases like Mr. Thompson's that involve a relatively small amount of pornographic material and a low-risk defendant. See ***United States v. Duhon***, 541 F.3d 391, 399 (5th Cir. 2008) (finding term of probation substantively reasonable for

defendant who had downloaded 15 images and had no criminal history); *United States v. Rowan*, 530 F.3d 379, 381 (5th Cir.2008) (finding term of probation substantively reasonable for offender who had over 400 images, but would benefit most from continuing with his treating psychologist).

One case involving a defendant similarly situated to Mr. Thompson is particularly instructive. *United States v. D.M.*, 942 F.Supp.2d 327 (E.D.N.Y. 2013). In that case, the defendant was 22 at the time of sentencing, so, like Mr. Thompson, had committed his offenses at a younger age. *Id.* at 329. Also, like Mr. Thompson, the defendant had "never acted out against a child or anyone else." *Id.* The defendant's therapist reported the defendant had been highly motivated to make improvements and change his life, much like the comments Mr. Nachtigal has made about Mr. Thompson. *Id.* at 346. The District Court in that case found a term of probation to be appropriate for this youthful offender who had made strides toward rehabilitation. *Id.* at 353.

This Court should consider the nature of Mr. Thompson's specific offenses. All child pornography offenses are serious, but there are gradations, as reflected in statutes and the guidelines themselves. Mr. Thompson had a very small amount of material on his devices, though the outdated guidelines make no distinction between him and someone with a collection 100 times larger. Mr. Thompson did not organize these materials in any way, nor did he back up these materials, as so many offenders do. Finally, his devices show no history of participating in any online communities of child pornography offenders. Mr. Thompson's offense is on the lowest end of the spectrum of such offenses.

II.    **In its current form, §2G2.2 rests on congressional assumptions that are contrary to empirical evidence and commission action unsupported by empirical evidence or national expertise and results in a sentencing range that is greater than necessary to serve the purposes of sentencing or any other sound policy goal.**

As the Tenth Circuit recently clarified in *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014), even though the sentencing court shall consider the applicable guideline range, "[t]o be sure," a district court that disagrees with the child-pornography production guideline on policy grounds "may vary from the Guideline." *Id*. at 911 ("To be sure, district courts that disagree with § 2G2.2 may vary from the Guidelines.") (quoting *United States v. Ngheim*, 432 Fed. Appx. 753, 757 (10th Cir. 2011) (unpublished)); *see also United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) ("Although sentences imposed within the correctly calculated Guidelines range may be presumed reasonable on appeal, sentences imposed outside the Guidelines range may not be presumed unreasonable.").

Indeed, a key component of Supreme Court holdings, designed to ensure that the Guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an

12

abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Hence, Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under § 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). "*[A]ll of the sentencing guidelines are advisory,*" including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id*. at 328.

This Court therefore may properly find that §2G2.2 was not developed by the Commission based on empirical data and national experience and, consistent with the

Supreme Court's repeated recognition that when a guideline is not based on empirical data of past sentencing practices and national sentencing experience, it is likely that the guideline does not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *See Kimbrough*, 552 U.S. at 109-10. Accordingly, a court may afford less respect to the guideline by granting a policy-based variance from that would not be subject to "closer review" or be considered "suspect" by a reviewing court. *Id*.

In the last ten years, the sentencing guidelines governing child pornography offenses have come under careful scrutiny and faced substantial criticism for their basis in politics—that is, in the passions and inclinations of the mob—rather than soundly based upon data or expertise. In 2009, for example, the Commission chronicled the federal non-production child pornography guidelines from their inceptions, placing emphasis on the changes in increased sentencing effected by the new mandatory statutory-minimums promulgated by the PROTECT Act. *See* U.S. Sent'g Comm'n, *History of the Child Pornography Guidelines* (Oct. 2009). The 2009 Report indicated there can be no doubt that Congress has significantly interfered with sentencing policy in this area such that the child-pornography guidelines are not the product of Commission studies or national expertise. *See, e.g.,* **United States v. Dorvee**, 616 F.3d 174, 184-85 (2nd Cir. 2010) ("Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines . . . several times since their introduction in

1987, each time recommending harsher penalties. (citing U.S. Sent'g Comm'n, *History of the Child Pornography Guidelines* (Oct. 2009) (internal citation omitted)).

For example, in 2004, in response to the passage of the PROTECT Act, the Commission arbitrarily increased the guideline ranges in child pornography offenses in an effort to make them coterminous with the new mandatory minimum sentences meted out by Congress. *See* USSG, Appendix C, Amend. 664 ("[T]he amendment increases the base offense level of 2G2.1 . . . from level 27 to 32. A base offense level of 32 is appropriate for production offenses because combined with the application of several specific offense characteristics that are expected to apply in almost all production cases . . . this base offense level will ensure that the 15-year mandatory minimum . . . will be met.") Notably, after the Commission's arbitrary increase, the average prison sentences for offenders increased exponentially:

> Average prison sentence for production offenses increased from 63.5 months in 1992 to 153.4 months in 2004, the year after the PROTECT Act was enacted. As more offenders thereafter were subject to the increased penalty provisions in the PROTECT Act, sentences continued to increase, and by 2009 average sentences hit their high point (282.9).

2012 Report to Congress, *supra* at 253.

In 2012, the Commission expanded upon its 2009 research when it produced a comprehensive report to Congress examining child pornography offenses again, with an emphasis on non-production offenses. Report to Congress, *supra*. The Commission noted that it compiled the report in large part because of the increasing rate of below-guideline sentences imposed on individuals convicted in child pornography cases, and pursuant to the Commission's statutory duty "to consider whether the guidelines are in need of

revision in light of feedback . . . reflected in [judges'] sentencing decisions." *Id.* at ii. Additionally, the commission noted the need to review the guidelines "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguish among offenders based on their degrees of culpability." *Id.* at ii., 323.

For example, both §2G2.1, the guideline addressing production of child pornography, and §2G2.2, the guideline at issue in Mr. Thompson's case, contain the same specific enhancement for factors such as age of the minor involved in the offense, which are present in a large majority of child-pornography cases. The first 2-level specific-offense enhancement under §2G2.1 for conduct involving a minor under the age of 12 has warped since 1987 into either a 2- or 4-level increase depending on the age of the victim. USSG §2G2.1(b)(1)(A). The Commission recognized in its 2012 report that since 1996, "this enhancement has consistently applied in approximately 90 percent of [production] cases . . . ." 2012 Report to Congress, *supra* at 261; *see also* USSC, *Use of Guidelines and Specific Offense Characteristics: Offender Based* 41 of 81 (FY 2015) (documenting that in FY 2015, the age-of-the-minor enhancement applied in over 90% of all §2G2.1 cases). The prevalence of the age-specific-offense-enhancement describes conduct that, because of its consistent application, is in essence inherent to the crime itself. Enhancements that apply in almost every case are thus contrary to the purpose of offense-specific enhancements—that is, sentencing enhancements that are meant to increase a sentence for a defendant's aggravating conduct.

Of course, the applicable section of the guideline—whether empirically based or not—remains one factor this Court must consider in reaching Mr. Thompson's individualized sentence. *See Grigsby*, 749 F.3d at 911. But, as the Tenth Circuit reiterated in *Grigsby*, even though the sentencing court shall consider the applicable guideline range, "[t]o be sure," a district court that disagrees with the guideline may vary from it. *Id.* at 911 ("To be sure, district courts that disagree with [the applicable guideline] may vary from the Guidelines.") (quoting *United States v. Ngheim*, 432 Fed. Appx. 753, 757 (10th Cir. 2011) (unpublished)); *see also Dorvee*, 616 F.3d at 188 ("District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under 2G2.2—ones that can range from non-custodial sentences to the statutory maximum—bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.").

It is the duty of sentencing courts to prevent injustices by the hand of the government. As Judge Weinstein cogently expressed, it is the court that "must decide: does this law violate the essence of my duty to self and humanity?" Jack B. Weinstein, *Every Day Is A Good Day for a Judge to Lay Down His Professional Life for Justice*, 32 Fordham Urb. L. J. 131, 155 (2004). Here, a sentence to probation will respect the distinction between Mr. Thompson's culpability and individual circumstances, *see infra*, and the draconian structure of USSG §2G2.2, which, as currently drafted, is driven by political persuasion and mob mentality rather than grounded in any scientific, statistical, or empirical method to balance the competing interests of sentencing.

17

### III.     The sentence requested would sufficiently promote respect for the law and afford adequate deterrence in light of the seriousness of the offense.

Of course, whether to vary from the guideline range based on policy considerations is only one factor that a court must consider in fashioning a defendant's individualized sentence, and appellate courts owe due deference to a district court's decision to deviate from the guidelines based sentencing factors when considered as a whole. *Huckins*, 529 F.3d at 1317 (acknowledging that the district court "has an unquestionable institutional advantage over an appellate court to consider whether the facts of an individual case justify a variance").

Advances in technology have rapidly changed the nature of child-pornography offenses. In the past, child pornography had to be produced and obtained in a risky and secretive manner for substantial sums of money. Today, images of child pornography are easily produced and available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit child-pornography offenses than was previously the case, even though the guideline range is much higher than it was previously. In 1992, the government prosecuted only 10 cases for production. *See* 2012 Report to Congress, *supra* at 247. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996). In 2010, the government prosecuted 207 production cases, and in 2011 it prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, where 97% of the 1,645 defendants used a computer. *See*

2012 Report to Congress, *supra* at 247; U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g. Comm'n, 2011 *Sourcebook of Federal Sentencing Statistics*, tbl. 17.

Hence, the internet and the ever-increasing prevalence of electronic devices has altered the very nature of child pornography offenses in a way the guidelines have not yet acknowledged. While it would now be the rare child pornography case that did not involve a computer, § 2G2.2(b)(6) still imposes a two-level "enhancement" for the use of a computer in the commission of the crime. An enhancement that applies to every offender, though, is not a true enhancement. The swift changes in—and access to— technology and electronic devices is relevant, in part, because it means that even as the population of child-pornography offenders has become less dangerous, punishment has steadily and greatly increased. In determining an appropriate and just sentence, this Court must consider the sentence available by statute. 18 U.S.C. § 3553(a)(3). By taking an already inflated base-offense level and enhancing sentences based on factors that are inherent in the crime, §2G2.2 fails to provide any meaningful distinction between offenders, and thus fails to provide for proportionality in punishment among offenders and offenses of different seriousness and culpability. Under the circumstances unique to Mr. Thompson and his crime of conviction, a sentence to probation is the greatest sentence necessary to achieve the sentencing goals of § 3553(a).

It is also proper for this Court to consider the lasting, collateral effects of Mr. Thompson's conviction requiring that he register as a sex-offender for what inevitably will be the rest of his life. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th

Cir. 2008) (holding that the district court correctly considered the collateral consequences of "the lasting effects of having to register as a sex offender"). The Tenth Circuit recently held that it is improper for a court to focus on collateral factors such as negative "publicity, loss of license, and deterioration of physical and financial health," in fashioning a sufficient sentence because these factors do not "reflect upon the seriousness of his offense," and because such factors "impermissibly favor criminals, like [the defendant], with privileged backgrounds." *United States v. Morgan*, 635 Fed.Appx. 423 at *20 (10th Cir. 2015) (unpublished). But unlike the factors supported by the *Morgan* court's rationale, it is axiomatic that today's onerous federal and state sex-offender-registration schemes do "reflect upon the seriousness" of an offense and do not discriminate against any class of offenders, socio-economically or otherwise. Therefore, it is proper for this court to consider this collateral consequence of Mr. Thompson's conviction.

Notably, the oft-touted argument underlying Congress's and the Commission's increased sentences for child-pornography offenders does not apply here—that is, the argument that increasing punishment for child pornography offenses will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). Congress relied on this same view when it directed the Commission to increase the base offense level in 1991. See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").

20

Here, however, Mr. Thompson did not expand the child-pornography market by producing any content. And what's more, Congress was mistaken in its beliefs about the deterrent effect that increased sentencing would have on the child-pornography market. The production, trading, and viewing of child pornography takes place on a global stage that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Thompson is incarcerated for one year or for 30. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010), and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of one whose offenses did not involve distribution or the commission of a sexual act will have little impact on the proliferation of child pornography in the world. Furthermore, an offender like Mr. Thompson who did not participate in online forums or message groups is even less likely to have any meaningful impact on the child pornography market.

      A.    *The need to avoid unwarranted sentencing disparities.*

Mr. Thompson's request that he be sentenced below the guidelines range is also supported by the need to avoid unwarranted sentence disparities between individual

offenders whose offense and characteristics are similar in ways relevant to sentencing. Under current law, sentencing courts must consider the sentencing practices of other courts. *Kimbrough*, 552 U.S. at 108.

The guidelines give heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded, particularly in this case. Here, a sentence within the guidelines range would create the type of sentence disparity that violates § 3553(a)(6) given that it fails to take into account any of Mr. Thompson's characteristics, which demonstrate that imprisoning him now is greater than necessary to fulfill Congress's sentencing goals. In this case, a substantial variance is therefore necessary to avoid unwarranted uniformity between Mr. Thompson's case and dissimilar defendants who committed dissimilar, and far more egregious conduct. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

Here, to say that a sentence anywhere near the guidelines range is "not greater than necessary," denotes that, despite all the mitigating factors that distinguish the nature of Mr. Thompson's character, lessen his culpability, and demonstrate his capacity for and commitment to rehabilitation, society is not only unwilling to break the cycle of retribution and suffering, but also that it is incapable of exercising its merciful discretion in an effort to heal. *See* Bryan Stevenson, Just Mercy: A Story of Justice and Redemption ("The power of just mercy is that it belongs to the undeserving. It's when mercy is least expected that it's most potent—strong enough to break the cycle of victimization and victimhood, retribution and suffering. It has the power to heal the psychic harm and

injuries that lead to aggression and violence, abuse of power, and mass incarceration."). Mr. Thompson has already made great strides in his personal effort to heal and forge a new path in life. Rather than providing Mr. Thompson with "correctional treatment in the most effective manner," incarcerating him now would only serve to disrupt those efforts. 18 U.S.C. § 3553(a)(2)(D).

By properly counterbalancing the nature of the offenses against Mr. Thompson's personal characteristics and individual circumstances, any sentence greater than probation, including whatever conditions and treatments this Court deems appropriate, would be "greater than necessary" to serve the goals mandated by § 3553(a). Mr. Thompson has suffered and will continue to suffer substantial mental and personal anguish over his conviction, and the consequences of his conviction on those he loves, especially on his parents and fiancée. But, as counsel and this Court know, each of us is more than the worst things we've ever done. Mr. Thompson is certainly not irredeemable. Indeed, he has already demonstrated his capacity for growth and maturation during the pendency of this case. His efforts to change his life for the better even while facing criminal charges, when many would have given up such efforts, shows the strength of his character. He accepts that he will receive just punishment for this very serious crime, but just punishment is not a sentence inflated by the whims and fears of the masses that has no basis in deterrence or reducing the already extremely low possibility of recidivism. A term of probation imposed by this Court is sufficient but not greater than necessary under the circumstances unique to Mr. Thompson's case to serve the sentencing goals of § 3553(a).

## CONCLUSION

Congress itself acknowledged in the Sentencing Reform Act, and as set forth in the *Guidelines Manual*, "it is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision." In light of all the § 3553(a) factors, a non-incarceration sentence to a term of probation and lifetime registration, and that Mr. Thompson undergo any further treatment deemed necessary, is sufficient but no greater than necessary to serve the goals of Section 3553(a).

MONNAT & SPURRIER, CHARTERED

s/ Trevor Riddle
TREVOR RIDDLE, #22224
Attorney for Defendant Shea Thompson
Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax: (316) 264-4785
Trevor.riddle@monnat.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Jason Hart
jason.hart2@usdoj.gov

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

Mr. Jeffrey Blessant
U.S. Probation Officer
401 N. Market, 3rd Floor
Wichita, KS 67202


Mr. Shea Thompson

<div style="margin-left:40%;">

<u>s/ Trevor Riddle</u>
TREVOR RIDDLE, #22224
Attorney for Defendant Shea Thompson
Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax: (316) 264-4785
Trevor.riddle@monnat.com

</div>